United States District Court
Southern District of Texas
**ENTERED**
June 22, 2022
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SHEILA FOSTER, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-20-3978 |
| | § | |
| UNITED AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND OPINION

Sheila Foster has worked at United Airlines since 2011.  She was working in food services when she injured her knee in March 2012.  When she returned to work about a month later, United accommodated her injury by transferring her to a position as a customer service representative, placing a six-hour cap on the number of hours that she had to work in a day, and exempting her from working "mandatory overtime" if it required her to work beyond her six-hour maximum.

In 2015, Foster went on Extended Illness Status (EIS) leave to have several surgeries. Extended Illness Status is designated for an employee "who exhausts his or her sick leave" but "remains unable to work" "due to illness or injury."  (Docket Entry No. 47-1 at 82).  It is unclear from the record whether this leave was paid or unpaid, (*see id.* at 1–2, 26, 82), and the parties do not clarify in their briefs or record submissions.

After two years of Extended Illness Status, Foster sought to return to the same customer service representative position she had held, with the same cap on the number of hours per day and the same exemption from mandatory overtime.  United denied the request on the ground that the ability to work mandatory overtime was an essential function of her position.  United informed

1

Foster that because she could not work any mandatory overtime, she could not return to work in the same position.

To give Foster time to find another position at United, United placed Foster back on Extended Illness Status. United warned Foster that her leave would be depleted by the end of December 2018, when she would be "administratively terminated." Foster did not apply for any other position that she was eligible to hold. United extended Foster's leave to the end of January 2019 to give her additional time to apply for other positions. Foster did not do so. Her leave ended in January 2019, and Foster was fired in February 2019.

In this lawsuit, Foster asserts claims against United for disability discrimination, retaliation, and a hostile work environment under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213. United moved to dismiss Foster's disability-discrimination and retaliation claims under Rule 12(b)(1), which this court granted with respect to Foster's disability-discrimination claim and denied with respect to Foster's retaliation claim. (Docket Entry No. 23). United has now moved for summary judgment on Foster's remaining retaliation and hostile-work environment claims. (Docket Entry No. 47). Based on the motion, response, and reply, the record and the applicable law, the court grants the motion for summary judgment and dismisses Foster's remaining claims, with prejudice. Final judgment is entered by separate order.

The reasons are explained below.

## I.   Background

Sheila Foster's work life has been marked by injury. Foster was first injured over 30 years ago when she fell 25 feet onto concrete. (Docket Entry No. 47-2 at 18:1–17). She was hospitalized and suffered permanent, severe nerve damage. (*Id.* at 18:18–19:12). In 1993, Foster started

receiving disability benefits from the Social Security Administration for emotional and physical disabilities related to her injury.  (*Id.* at 45:22–48:11).

In 2011, Foster was hired as a part-time Transportation Agent in the catering division of Continental Airlines, United's predecessor.  (*Id.* at 60:5–15; Docket Entry No. 47-1 at 3).  On March 5, 2012, Foster slipped and fell at work while stepping down from the back of a work truck. (Docket Entry No. 47-1 at 7, 14; Docket Entry No. 47-2 at 62:7–15).  There is conflicting evidence about the extent of Foster's injuries from the fall, with some evidence showing that Foster injured several body parts, including her right knee, leg, and lumbar area, and other evidence showing that Foster injured only her right knee.  (*Compare* Docket Entry No. 47-2 at 43:25–44:2, 62:7–15, Docket Entry No. 47-1 at 14; *with* Docket Entry No. 47-2 at 64:19–65:11, Docket Entry No. 47-1 at 13, 16).  Foster filed a worker's compensation claim for her injury.  (Docket Entry No. 47-1 at 12–17; Docket Entry No. 47-2 at 61:13–16, 64:23–65:1).  She returned to work on light duty on April 23, 2012.  (Docket Entry No. 47-2 at 62:25–64:13).

Foster's doctor provided United a letter stating that she could work no more than six hours a day.  (Docket Entry No. 47-2 at 35:15–17, 79:7–80:8).  To accommodate her six-hour work restriction, United transferred Foster to a part-time Airport Sales Agent Position in October 2012. (Docket Entry No. 47-1 at 2; Docket Entry No. 47-2 at 65:18–22, 79:15–80:08).  A year later, after the Continental-United merger, Foster's title changed to Customer Service Representative, but her duties and pay remained the same.  (Docket Entry No. 47-2 at 60:23–61:3, 65:23–66:3; Docket Entry No. 47-1 at 2).

Foster claims that after she returned to work after her knee injury in 2012, she received an exemption from working mandatory overtime if it required her to work more than six hours in a day.  Mandatory overtime "is overtime that an employee is assigned and required to work

3

involuntarily . . . when sufficient voluntarily overtime cannot be secured to maintain [United's] operation." (Docket Entry No. 47-1 at 47).  The parties do not identify documents in the record showing that Foster received this exemption from mandatory overtime.  There is some evidence that Foster worked a short amount of mandatory overtime exceeding her six-hour-per-day restriction on at least one occasion, in August 2014.  (Docket Entry No. 47-1 at 18–19, 89–90; Docket Entry No. 47-2 at 72:21–77:21; 85:10–21).

Despite these accommodations, Foster's supervisors at times assessed her absence "points" for missing work, which she claims was due to her health issues.  (*Id.* at 82:20–83:4).  Foster met with Kim Kerr, Gilbert Greene, and Stephanie Steinke in Human Resources to explain her attendance problems and to clarify the procedure for leaving work at the six-hour mark, even during mandatory overtime.  (*Id.* at 83:13–84:14).  Human Resources told Foster that she should call staffing to tell them that she was leaving whenever she was asked to work more than six hours in a single day.  (*Id.*).

On May 31, 2015, Foster stopped working after she injured her shoulders by pulling on aircraft doors.  (Docket Entry No. 47-1 at 21–22; Docket Entry No. 47-2 at 87:9–89:14).  Orthopedic doctors diagnosed Foster with left shoulder impingement and rotator cuff tear, and she had surgery to repair her left shoulder on June 2, 2015.  (Docket Entry No. 47-1 at 25; Docket Entry No. 47-2 at 90:17–92:6).  Later that month, Foster also underwent a decompression and fusion procedure on her cervical spine.  (Docket Entry No. 47-1 at 24).  On July 30, 2015, United placed Foster on Occupational Extended Illness Leave.  (*Id.* at 26).

On August 28, 2015, United sent a letter to Foster inviting her to use the company's Reasonable Accommodation Program interactive process so that she could return to work.  (*Id.* at 29; Docket Entry No. 47-2 at 95:18–96:7).  The Reasonable Accommodation Program is a

"voluntary interactive process involv[ing] . . . local management, Human Resources, a [Reasonable Accommodation Program] Administrator at the Employee Service Center . . . and, when appropriate, a Worker Compensation [S]taff Representative working together with [the employee] to identify reasonable accommodation options." (Docket Entry No. 47-1 at 50). As part of the process, Foster's doctors sent United required medical forms assessing Foster's medical condition and work restrictions. (Docket Entry No. 47-1 at 28, 36–37; Docket Entry No. 47-2 at 96:11–97:11).

United held a Reasonable Accommodation Program meeting with Foster on October 15 or 16, 2015. (Docket Entry No. 47-1 at 38–39; Docket Entry No. 47-2 at 97:22–98:15). At that meeting, United informed Foster that it could not reasonably accommodate her work restrictions without compromising the essential job functions of her current position. (Docket Entry No. 47-1 at 39; Docket Entry No. 47-2 at 98:16–24). It is unclear whether Foster and United specifically discussed a mandatory overtime exemption at the October 2015 meeting. United informed Foster that her current leave status would continue until she could secure a position compatible with her work restrictions. (Docket Entry No. 47-1 at 39; Docket Entry No. 47-2 at 98:25–99:4). Foster did not return to United in any role, however, because between February 2016 and September 2017, Foster underwent additional surgeries on her left shoulder, right shoulder, lumbar spine, and cervical spine, requiring her to remain on Extended Illness Leave. (Docket Entry No. 47-1 at 40–45; Docket Entry No. 47-2 at 99:7–100:9).

While Foster remained on Extended Illness Status, United entered into a collective bargaining agreement on April 18, 2016, with the International Association of Machinists and Aerospace Workers, the union representing the Customer Service Representative work group. (Docket Entry No. 47-1 at 46–48). That Agreement stated that "[m]andatory [o]vertime is

overtime that an employee is assigned and required to work voluntarily, and will only be required in operational emergencies when sufficient voluntarily overtime cannot be secured to maintain the Company's operation."   (*Id.* at 47).   The Agreement stated that "[m]andatory overtime will be assigned in reverse bid seniority order according to shift time, except that employees already working overtime will be assigned last."   (*Id.*).

On December 5, 2017, Foster and United renewed the Reasonable Accommodation Program interactive process because Foster was then ready to return to work.   (*Id.* at 49–50; Docket Entry No. 47-2 at 100:5–9).   United required a doctor's letter identifying any work restrictions. Foster's doctor, Dr. Michael Leahy, certified that she could return to work but not for more than six hours a day and could not lift more than 50 pounds.   (Docket Entry No. 47-1 at 58).   Dr. Leahy also indicated that Foster could control her pain with prescription medication.   (*Id.*).   On December 19, United sent a letter to Foster requesting confirmation that the pain medication would not cause side effects or impairment affecting her work.   (*Id.* at 59).   Foster's prescribing physician, Dr. Tim Paschalis, sent United a list of Foster's pain medications and a signed statement that she only took them at home and would leave work early if she needed to take them at work.   (*Id.* at 60; Docket Entry No. 47-2 at 100:13–101:24).   On January 9, 2018, Foster emailed United to affirm her awareness of the risks involved with the pain medications and her compliance with her doctor's orders.   (Docket Entry No. 47-1 at 61; Docket Entry No. 47-2 at 101:17–103:2).

Foster met with United employees for another Reasonable Accommodation session on February 8, 2018.   (Docket Entry No. 47-1 at 62–63; Docket Entry No. 47-2 at 104:10–106:24). They discussed Foster's work restrictions and her prior exemption from mandatory overtime.   (*Id.*). The Reasonable Accommodation Program team explained to Foster that mandatory overtime had been part of Foster's "contract since 2013 and that there [were] no exemptions."   (Docket Entry

No. 47-1 at 62).   Foster and the Reasonable Accommodation Program team reconvened their meeting on March 5, 2018.  (Docket Entry No. 47-1 at 64; Docket Entry No. 47-2 at 107:14–108:15).  Kathy Page, a Human Resources manager, told Foster that Human Resources was continuing to search for any information about Foster's alleged exemption from mandatory overtime before 2014, and again "[e]xplained [that] overtime [was] an essential function of [Foster's] job."  (Docket Entry No. 47-2 at 108:6–11).

On March 12, 2018, Foster returned to work to attend a training class, even though she had still not completed the Reasonable Accommodation Program process.  (Docket Entry No. 47-1 at 65–68; Docket Entry No. 47-2 at 108:16–109:2).  The next day, United's Employee Service Center informed Gwen Taylor, Manager of Dependability and Labor, that Foster had not completed the full clearance and background check required to return to work and to attend training.  (Docket Entry No. 47-1 at 66; Docket Entry No. 47-2 at 153:22–154:16).  Foster testified that Taylor and Area Manager Rico Wallace interrupted Foster's training by knocking on the door and "shout[ing]" across the room that they needed to see her.  (Docket Entry No. 47-2 at 156:4–9).  According to United's records, Taylor and Wallace "talked to" Foster about her lack of clearance.  (Docket Entry No. 47-1 at 66).  Foster testified that she was "humiliated," "embarrassed," and anxious when Taylor and Wallace took her out of the class.  (Docket Entry No. 47-2 at 157:2–17, 158:2–7).  Taylor and Wallace told Foster that she could not continue in the training until she had completed the process needed to return to work.  (Docket Entry No. 47-1 at 66; Docket Entry No. 47-2 at 156:12–15).  Foster testified that Taylor said that she would contact corporate to check on the badge clearance process, but that Taylor never followed through.  (Docket Entry No. 47-2 at 153:24–154:3, 154:4–12).  Foster testified that Taylor "intentionally" failed to clear her badges. (*Id.* at 154:17–22).  Foster completed the badge clearance process and returned to training class

five days later.  (Docket Entry No. 47-1 at 66; Docket Entry No. 47-2 at 156:16–18).  When she returned, several coworkers questioned Foster about why she had been pulled from the training.  (Docket Entry No. 47-2 at 156:19–23).

Foster and the Reasonable Accommodation Program team met again on May 23, 2018, to continue the accommodations process.  (Docket Entry No. 47-1 at 69; Docket Entry No. 47-2 at 113:4–14).  At that meeting, Kathy Page asked Foster to provide a revised work restriction status letter from her doctor.  (Docket Entry No. 47-1 at 69).  Foster provided the requested work restriction from signed by Dr. Paschalis on May 31, 2018.  (Docket Entry No. 47-1 at 70; Docket Entry No. 47-2 at 113:15–114:6).

Foster and the Reasonable Accommodation Program team reconvened their meeting on June 8, 2018, to continue the Reasonable Accommodation Program process in light of Foster's updated work restrictions.  (Docket Entry No. 47-1 at 71-72; Docket Entry No. 47-2 at 115:6–116:3).  Page informed Foster that United would give her a 90-day temporary accommodation that would allow her to leave work at the six-hour mark, even if mandatory overtime was called.  Page explained that Human Resources "want[ed] to see how often mandatory overtime [was] called." (*Id.*).  In a June 14 letter to Foster, United explained that the accommodation would expire after 90 days because United did not exempt employees in Foster's position from "the essential function of mandatory overtime for more than 90 days."  (Docket Entry No. 47-1 at 73–74; Docket Entry No. 47-2 at 116:4–18).  The 90-day period expired on October 8, 2018.  (*Id.*)

On October 2, 2018, United scheduled another Reasonable Accommodation Program meeting.  (Docket Entry No. 47-1 at 75; Docket Entry No. 47-2 at 118:13–19).  Foster submitted a medical work restriction form showing that she continued to require the same accommodations as she did in May 2018.  (Docket Entry No. 47-1 at 76; Docket Entry No. 47-2 at 118:20–119:13).

At that meeting, Kathy Page and others informed Foster that they were still unable to accommodate her work restrictions in her current job classification in a way that would allow her to perform the essential function of mandatory overtime.  (Docket Entry No. 47-1 at 78; Docket Entry No. 47-2 at 119:22–120:3).  Page also "discussed the possibility of a reasonable accommodation outside of [Foster's] current position," "reviewed the process of reassignment through the [Reasonable Accommodation Program process]," and "discussed [Foster's] interests in other positions as well as generally reviewed alternate positions [that would be] consistent with [Foster's] restrictions." (Docket Entry No. 47-1 at 78).

On October 23, 2018, the day after the Reasonable Accommodation Program meeting, United informed Foster that her absence from work had been approved by United Medical through January 22, 2019.  (*Id.* at 79).  United informed Foster that her Extended Illness Status leave would continue until her work restrictions changed or she found another position consistent with her restrictions.  (*Id.* at 78).  Foster asserts that she should not have been placed on this leave, because she wasn't "sick," and her doctor sent United a letter to that effect.  (Docket Entry No. 47-2 at 126:21–127:7).  That letter does not appear in the record.

On October 24, 2018, soon after the meeting, Foster emailed United Medical with concerns about the Reasonable Accommodation Program group's decisions not to accommodate her work restrictions and to place her on extended leave.  (Docket Entry No. 47-1 at 85–86; Docket Entry No. 47-2 at 127:8–19).  She stated that nothing prevented her from working as a Customer Service Representative at the gates except United's view of mandatory overtime as an essential part of that job.  (Docket Entry No. 47-1 at 85–86).  She reminded United that before her extended leave, she had been exempt from mandatory overtime.  (*Id.*).  She stated that the October 22 Reasonable Accommodation Process meeting summary, (*id.* at 78), inaccurately reported that United reviewed

with Foster the process of applying for other positions.  (*Id.* at 85).  She stated that she knew two agents who would help her shift trades to address potential conflicts between mandatory overtime and her work restrictions.  (*Id.*).

Kathy Page responded to Foster on November 12, 2018.  (*Id.* at 87–94).  Page stated that Foster's six-hour work restriction, certified by Foster's doctor, prevented Foster from performing mandatory overtime, an essential function for a Customer Service Representative.  (*Id.* at 87–88). Page noted that Foster had worked mandatory overtime on at least two occasions before her extended medical leave.  (*Id.* at 87, 89–90).  Page stated that having two other agents trade shifts with Foster would not permit Foster to perform mandatory overtime, which was an essential function for the Customer Service Representative job. (*Id.* at 88).  Page partially denied the alleged inaccuracy of the October 22 meeting summary, stating that internal job transfers were discussed. (*Id.*).  Page acknowledged that United had not orally given Foster instructions on how to search for management, union, or salaried postings, but that Page had attached those instructions to the email she sent to Foster.  (*Id.* at 88, 91–92).

In November, a United Absence Management Operations Manager informed United Human Resources that Foster's leave would expire on December 4, 2018, and that she would be separated from the company at that point.  (*Id.* at 80–82).  United informed Foster of the December 4 leave-expiration date at the next Reasonable Accommodation Program meeting on November 29, 2018.  (*Id.* at 95).  At that meeting, Page mentioned the possibility of a full-time job opening in reservations, but Foster did not apply because she felt its full-time status would not work for her disabilities.  (*Id.* at 100; Docket Entry No. 47-2 at 122:17–123:10).

Foster alleges that Page also suggested that Foster ask her doctor if the number of hours she could work could be increased to facilitate her return to work.  Foster testified that Page was

directive, telling Foster to "[h]ave your doctor change your paperwork, and I'll let you come back to work." (Docket Entry No. 47-2 at 160:18–161:1). United claims that Page merely asked Foster to ask her doctor to clarify whether she could "occasionally and unfrequently" work more than six hours. (Docket Entry No. 47-1 at 95). Foster's doctor declined to relax her six-hour work restriction. (Docket Entry No. 47-2 at 161:12–15).

Although Page told Foster to apply for other positions within United that might accommodate her work restrictions, (Docket Entry No. 47-1 at 78; *see also* Docket Entry No. 48 at § III.B.5), Foster testified that she applied to only one job—a customer service position in the United Club lounge. (Docket Entry No. 47-2 at 122:3–17). When Page and another United employee met with Foster on January 11, 2019, to discuss her request to return to work, they informed Foster that the United Club opening for which she had applied also required mandatory overtime as an essential function of the job. (Docket Entry No. 47-1 at 103). Foster did not apply to any other openings.

United agreed to extend Foster's leave to January 23, 2019, to allow time for United to assess her application to the United Club in light of her restrictions, and for Foster to apply for other positions. (*Id.*). The evidence shows no attempt by Foster to apply for any open position other than the United Club opening, a job that could not accommodate her six-hour workday, no-mandatory-overtime limits. (Docket Entry No. 47-2 at 122:11–17). Foster's leave expired on January 23, 2019, and Foster was "administratively terminated" on February 26, 2019. (*Id.* at 136:10–14; Docket Entry No. 47-1 at 105, 110). "Following administrative termination," Foster remained "eligible for re-hire." (Docket Entry No. 47-1 at 105). Foster still did not apply for any openings.

## II.     Legal Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citations and internal quotation marks omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).  "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019) (citation and internal quotation marks omitted).  In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor."  *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

III.    **Analysis**

A.    **Hostile Work Environment**

Foster alleges that United employees subjected her to a hostile work environment from March 2018 to November 2018, identifying seven separate incidents in which United employees made her feel embarrassed and humiliated because of her disability.

United argues that Foster has not pointed to evidence raising a factual dispute material to determining whether any of the seven incidents created a hostile work environment.  United claims that Foster has not shown two required elements of harassment: (1) that she was subjected to unwelcome harassment, and (2) that the harassment was based on her disability.

To show that disability-based harassment resulted in a hostile work environment under the Americans with Disabilities Act, a plaintiff must show that: "(1) [s]he belongs to a protected group, (2) was subject to unwelcome harassment (3) based on [her] disability, (4) which affected a term, condition, or privilege of employment, and (5) [the company] knew or should have known of the harassment and failed to take prompt, remedial action."  *Thompson v. Microsoft Corp.*, 2 F.4th 460, 471 (5th Cir. 2021) (citing *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235–36 (5th Cir. 2001)).  The harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.  *Id.* (citing *Flowers*, 247 F.3d at 236).  "In determining whether a work environment is abusive, [the court] considers the entirety of the evidence in the record, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance."  *Clark v. Champion Nat'l Sec., Inc.,* 952 F.3d 570, 585 (5th Cir. 2020) (quoting *Credeur v. La. Through Off. of Att'y Gen.*, 860 F.3d 785, 796 (5th Cir. 2017)) (internal quotation marks omitted).  "[S]imple teasing, offhand

comments, and isolated incidents (unless extremely serious) do not suffice to alter the terms and conditions of employment." *Thompson*, 2 F.4th at 471 (quoting *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 445 (5th Cir. 2017)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (a workplace "permeated with discriminatory intimidation, ridicule, and insult" is abusive). "Humiliating and offensive *ad hominem* attacks" bearing no rational relation to an employee's work performance can show harassment. *See Credeur*, 860 F.3d at 796.

Foster alleges seven instances of harassing conduct. Foster alleges:

- that after she was cleared to go back to work after surgery in March 2018, she was removed from a training program by United employees Taylor and Wallace, who "walked into one of Plaintiff's classes and yelled in front of the whole class for Plaintiff to come outside," and was then prohibited from returning to class until her work badges were cleared, (Docket Entry No. 48 at 10);

- that she received "points" against her employment record for absences that should have been excused under her disability accommodation, (*id.* at 11);

- that "at one point" when she tried to leave work after "a mandatory overtime was called, one of her supervisors questioned her about her need to leave due to her disability in front of other employees and customers," and "told [her that] she did not understand what mandatory overtime meant," and then "refuse[d] to let her leave for an hour," (*id.*);

- that Gwen Taylor, the Manager of Dependability and Labor, "intentionally" withheld information from United's new director of Human Resources, Kathy Page, about Foster's prior exemption from mandatory overtime, (*id.* at 11–12);

- that she was denied an extension of a 90-day temporary disability accommodation at the November 29, 2018, Reasonable Accommodation Program meeting, (*id.* at 11);

- that Kathy Page "intentionally" told her to apply to job openings for which she was not eligible because they were full-time and subject to mandatory overtime, (*id.* at 12); and

- that she was asked by Page to "commit fraud" by asking her doctor to increase her work-restriction hours, despite her disability, (*id.*).

These incidents—considered individually and collectively—do not support an inference that Foster was subjected to harassment that was sufficiently severe to create a hostile work environment.

Foster's two complaints about her supervisors—that they improperly assessed attendance points and that a supervisor failed to promptly dismiss her at the end of her six-hour shift on one occasion—may suggest poor management practices, but do not support an inference of actual harassment. Foster alleges no offensive *ad hominem* attacks, physical threats, or abuse. The evidence indicates that any wrongfully assessed attendance points were promptly removed after Foster notified Human Resources of the error, and that any difficulty Foster experienced in leaving her shift one evening was an isolated incident involving a single supervisor.

Foster also testified that she was "ridiculed" by her supervisors for leaving early, but she did not provide specific details about those incidents. Foster testified that on one occasion, her supervisor "ridiculed" her by asking if she knew what mandatory overtime was. This comment might be "insensitive and rude," but it is not "sufficient as a matter of law to state a claim of hostile environment harassment." *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 564 (5th Cir. 1998).

Foster also claims that she was "humiliated" when she was removed from a training session that she was not yet eligible to attend. Foster alleges that two United employees "yelled" and "shouted" across the room to make her leave the session; the employees claim that they merely "talked to" Foster. Even assuming that two employees yelled at Foster, this isolated incident, without further evidence of insulting or inappropriate language, does not rise to the level of harassment. *See id.*; *see also Thompson*, 2 F.4th at 471. The employees explained to Foster that she could not return to training until she received her work badges, but Foster alleges that Gwen

Taylor "intentionally" did not call the corporate office to clear Foster's badges so that she could return to work.  Foster has no evidence that Taylor acted with this intention.  Foster's speculation is insufficient.  And even if Taylor did not inquire about Foster's badges, this behavior does not rise to the level of harassment, because it "did not create an abusive working environment." *Clark*, 952 F.3d at 586.  After five days, Foster's badges were cleared and she was allowed to return to the training.  Although Foster claims that she received "embarrassing" questions from her coworkers upon her return about why she was removed from training, this incident did not "alter the terms and conditions of [her] employment." *Thompson*, 2 F.4th at 471.

Two incidents of alleged harassment involve United management's treatment of Foster's exemption from mandatory overtime.  Neither amounts to harassment or abuse.  During the Reasonable Accommodation process, the Reasonable Accommodation team members repeatedly explained to Foster that they were unable to locate any records of her alleged 2012-2015 exemption from mandatory overtime.  Foster claims that at least one manager, Gwen Taylor, knew of Foster's prior accommodation but "intentionally" withheld knowledge of it from other United staff.  Foster has no evidence that Taylor intentionally withheld this information, beyond her own speculation. (*See* Docket Entry No. 47-2 at 150:7–8 ("Again, you said how do I know.  I can't speculate on how Gwen knew.")).  "[C]onclusory allegations, unsubstantiated assertions, and speculation" cannot meet Foster's burden of raising a fact issue as to a hostile work environment.  *Eaton-Stephens v. Grapevine Colleyville Indep. Sch. Dist.*, 715 F. App'x 351, 353 (5th Cir. 2017).

Foster also alleges that Page and Taylor created a hostile work environment by refusing to extend her 90-day, temporary, mandatory overtime exemption in 2018.  There is no evidence that Page and Taylor denied an extension of this temporary exemption to harass Foster because of her disability.  First, an employer is not obligated to continue an accommodation indefinitely.  *See*

*Credeur*, 860 F. 3d at 797 (collecting Fifth Circuit cases).  Page and Taylor did not have to offer Foster a 90-day mandatory overtime exemption in the first instance, but did so as part of United's "effort to provide [Foster] with a reasonable accommodation."  *Id.*  Page and Taylor "always expressed the intention that the accommodation would be temporary."  *Id.*  Second, Page and Taylor explained to Foster that their decision was based on a legal requirement under the collective bargaining agreement that all employees work mandatory overtime without exemption.  Foster's disagreement with Page and Taylor's understanding of United's legal obligations does not suggest harassment.  *See Clark*, 952 F.3d at 585 ("a disagreement with an employer over terms of employment or an accommodation do[es] not amount to harassment.") (quoting *Credeur*, 860 F.3d at 797)).

Finally, Foster claims that Page harassed her by referring her to apply for jobs that Page knew could not accommodate Foster's disabilities, and by asking Foster to "commit fraud" by getting a doctor to increase her work-restriction hours.  No evidence in the record suggests that Page had an ulterior motive to harass Foster with illusory job openings, or that her inquiry into whether Foster's doctor might consider relaxing her work restrictions was motivated by animus. Evidence that Page encouraged Foster to apply for other United jobs in order to keep her employed, and asked Foster to check with her doctor to see if she was medically able to work infrequent eight-hour shifts in order to solve the mandatory overtime problem, does not raise an inference of a hostile work environment.  Foster points to evidence of a single instance when Page suggested that Foster should apply for a full-time position in reservations.  Even if Page was leading Foster toward a dead-end job opening—an allegation made without evidentiary support that this was the intent or effect—this single instance of suggesting another job opportunity in United was not "severe or pervasive and did not create an abusive working environment."  *Clark*, 952 F.3d at 586.

The parties dispute the exact comments that Page made to Foster about her restricted hours. Foster testified that Page told her that if she had her doctor change her hours to permit her to work more than six hours per day, Page would give Foster her job back.  United disputes this factual claim, pointing to meeting minutes stating that Page asked Foster if there was a possibility of medical approval for infrequent eight-hour shifts.  Under either scenario, Page's comments do not amount to harassment.  There is no evidence that Page put "any coercive pressure" on Foster or her doctor "to submit fraudulent [medical] documents." *Credeur*, 860 F.3d at 797.  Even if Foster "perceived" Page's comments as asking her to "commit fraud," Foster's "subjective physical and emotional reactions to her employer's conduct . . . do not establish that the work environment would have been perceived as hostile or abusive by a reasonable employee." *Id.* (citation and quotation marks omitted).

Summary judgment on Foster's hostile-work environment claim is granted.

**B.      Retaliation**

The Americans with Disabilities Act prohibits an employer from discriminating against any individual because the individual has opposed any act or practice made unlawful by the Act or because the individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act. *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 303–04 (5th Cir. 2020); 42 U.S.C. § 12203(a).  "To establish a prima facie case of unlawful retaliation under the Act, the plaintiff must show that: (1) she engaged in an activity protected by the Act, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action." *Lyons*, 964 F.3d at 304.

Once a plaintiff has made a prima facie showing of retaliation, "the employer must come forward with a legitimate, nondiscriminatory reason for its action." *Id.*  "If the employer meets its

burden of production, the employee must then demonstrate that the proffered reason is a pretext for retaliation." *Id.* "[T]he employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Id.*

Foster argues that she engaged in three protected activities: filing a complaint with the Equal Employment Opportunity Commission (EEOC), requesting accommodations for her disability, and sending a grievance email to United. She claims that United retaliated against her for these activities by keeping her on Extended Illness Status until her leave expired so that it could then fire her.

United does not dispute that Foster has made a prime facie showing of retaliation. United argues instead that Foster cannot point to sufficient evidence to support her claim that United's proffered reason for her termination—the expiration of her extended illness leave—was pretextual. Foster similarly does not dispute that United has "come forward with a legitimate, nondiscriminatory reason for its action." Foster argues that United's stated reason for termination—the expiration of leave—was pretextual.

To raise a factual dispute as to a causal connection between protected activity and an adverse action, a plaintiff must point to evidence showing that the employer's decision "was based in part on knowledge of the employee's protected activity." *Lyons*, 964 F.3d at 305 (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)). Foster has not pointed to evidence that any United employee involved in the Reasonable Accommodation Program was aware that Foster filed a discrimination complaint with the EEOC when deciding that Foster should remain on extended illness leave. But assuming, as United does, that Foster has made a prima facie showing, Foster's retaliation claim hinges on one issue: was United's stated reason for firing her pretextual? To survive a motion for summary judgment, Foster must present "substantial

evidence" that United's proffered legitimate reason for firing her was a pretext for retaliation. *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016).  Pretext can be established either through evidence of disparate treatment or by showing that United's proffered explanation was "false or unworthy of credence."  *Id.*  "[T]he inquiry is not whether [United] made a wise or even correct decision to terminate [Foster]," *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022), but whether United's justification was "not the real reason for the adverse employment action."  *Lindsey v. Bio-Med. Applications of La.*, *L.L.C.*, 9 F.4th 317, 325 (5th Cir. 2021).

Foster argues that United's stated reason for her firing—that she had used up all of her available leave—was "false or unworthy of credence" because United kept her on leave under false pretenses.  Foster argues that United kept her on Extended Illness Status to avoid granting her the accommodation that it had previously given her; that United kept her on Extended Illness Status even though she was "not sick"; and that Page, the Human Resources manager, "intentionally" referred Foster to full-time jobs that she was unable to perform.  These arguments are addressed in turn.

First, Foster argues that United's refusal to grant her an accommodation that it previously allowed shows that United was retaliating against her for complaining about United's "hostile treatment and failure to reasonably accommodate her disability."  (Docket Entry No. 48 at 7). Foster alleges that when she started as a Customer Service Representative in 2012, she received an accommodation that allowed her to leave work after six hours, even if mandatory overtime was called.  Foster went on extended medical leave in July 2015.  When Foster tried to return to the Customer Service Representative position in 2017, she was told that the same accommodation was

no longer available for the same position because "mandatory overtime" was now considered an "essential function" of the position.

A jury may infer pretextual reasoning from an employer's "inconsistent explanations" for its employment decisions. *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (collecting Fifth Circuit cases). Foster argues that United provided "inconsistent explanations" for its decision to keep her on extended medical leave, instead of allowing her to return as a Customer Service Representative, by asserting that "mandatory overtime" was an "essential function" of the position, despite allowing the same accommodation in 2013.

Foster does not point to evidence to support this argument. First, an employer does not have a legal obligation to continue an accommodation indefinitely. Second, United provided an explanation for its alleged inconsistency. United informed Foster in 2017 that it could not exempt a Customer Service Representative from mandatory overtime because of the collective-bargaining agreement that United had entered into with the union representing the Customer Service Representative work group in April 2016. That agreement states that "[m]andatory [o]vertime is overtime that an employee is assigned and required to work voluntarily, and will only be required in operational emergencies when sufficient voluntarily overtime cannot be secured to maintain the Company's operation." (Docket Entry No. 47-1 at 47). The agreement states that "[m]andatory overtime will be assigned in reverse bid seniority order according to shift time, except that employees already working overtime will be assigned last." (*Id.*).

United argues that it is required under the collective-bargaining agreement to assign mandatory overtime in reverse-seniority order. If Foster were exempt from working mandatory overtime, United would have to violate this provision of the collective-bargaining agreement by requiring someone more senior than Foster to work overtime in her stead. Other workers would

21

be required to cover for Foster.  United employees explained this to Foster during her Reasonable Accommodation Program meetings.  (*See, e.g.*, Docket Entry No. 47-1 at 62 ("Kathy stated that Sheila would not be exempt from mandatory overtime; it is essential function of job.  It is contractually by seniority and normally 4 hours. . . .  We cannot supersede seniority by law."); *id.* at 67 ("Our discussion on the RAP call . . . was regarding 'mandatory overtime,' which is contractual and an essential function of the [Customer Service Representative] job.  When the operation is stressed and we are cancelling flights or there is extreme weather, we call mandatory overtime by seniority.  It is usually an additional 4 hours.  If the work shift is 6 hours and the maximum number of hours she can work is 6, then she would not be able to meet the essential function of the [Customer Service Representative] job.")).

Because United maintained that mandatory overtime was an essential function of Foster's customer service position, and because Foster's six-hour work restriction prevented her from satisfying that essential function, United kept Foster on extended medical leave to give her an opportunity to use United's competitive transfer process to find another position with the company without mandatory overtime.  Despite two extensions of Foster's medical leave, Foster applied to only one position at United, which similarly required mandatory overtime.  (Docket Entry No. 47-1 at 103; Docket Entry No. 47-2 at 122:11–17).  When Foster finally ran out of medical leave, she still had not applied to a position at United, much less one that could accommodate her disability.  Without any alternative position at United, Foster's employment was administratively terminated.

 Even assuming that United was incorrect, unreasonable, or inconsistent in its assertion that mandatory overtime was an "essential function" of Foster's Customer Service Representative position, an unreasonable or incorrect decision is not, by itself, demonstrative of retaliatory

animus.[1]  *Circassia*, 33 F.4th at 826.  Foster has not provided or pointed to evidence that United employees deliberately or intentionally interpreted the collective-bargaining agreement to deny her requested accommodation and place her on medical leave long enough to fire her.  Foster does not provide or point to evidence that United considered mandatory overtime an essential requirement of the job as to her, but not as to any other similarly situated employee.  Instead, the record shows that from December 5, 2017, through her firing on February 26, 2019, United met with Foster at least six times to discuss possible available accommodations to allow her to return to work.  (*See* Docket Entry No. 47-1 at 62–63; *id.* at 64; *id.* at 69; *id.* at 72; *id.* at 78; *id.* at 95-102; *id.* at 103).  United told Foster to apply for other positions within the company that might accommodate her work restrictions.  (Docket Entry No. 47-1 at 78; Docket Entry No. 48 at § III.B.5).  United placed Foster on extended medical leave, with the warning that she would be separated from the company if she did not find a role, before December 4, 2018.  (Docket Entry No. 47-1 at 95–102).  When December 4, 2018, arrived and Foster had still not found another position at United, United extended her medical leave two more times to give her additional time to apply to other jobs within the company.

---

[1] Although it is clear that Foster wishes to litigate whether United's interpretation of the collective-bargaining agreement was correct, she cannot.  As this court stated in its Memorandum and Order granting in part and denying in part United's motion to dismiss, the Railway Labor Act, which was extended in 1936 to cover the airline industry, preempts judicial review of "minor disputes."  Minor disputes are disputes that grow "out of grievances or out of the interpretation of application of agreements covering rates of pay, rules, or working conditions."  *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252–53 (quoting 45 U.S.C. § 151a).  "Minor disputes," such as a dispute requiring the court to interpret a collective-bargaining agreement, must be arbitrated.

This court held that Foster's disability-discrimination claim was preempted by the Railway Act, because the court would be required to "interpret the collective-bargaining agreement" to determine whether "United's reason for terminating Foster under the collective-bargaining agreement was pretextual." (Docket Entry No. 23 at 11).  The court did not dismiss Foster's retaliation claim, however, because even if United's interpretation of the collective-bargaining agreement was relevant to the claim, it did not dispose of the claim.  The issue before the court is whether United fired Foster because of a retaliatory motive, not whether United correctly interpreted its collective-bargaining agreement.

These actions show concerted efforts by United and its employees to keep Foster within the company and to get her back in a part-time role.  Foster argues that it was improper for United to place her on extended sick leave, because she was "not sick."  But Foster was placed on extended medical leave as part of a long and ongoing interactive accommodation process in an attempt to comply with her physician's orders and to allow her time to find another job, not as punishment for requesting accommodations.  Even if United deviated from its standard use of extended sick leave, as Foster appears to argue, that does not suggest that United's stated reason for firing her was pretextual and does not suggest retaliatory animus.

Finally, Foster argues that even though United told her that she should apply for different jobs in the company, a United Human Resources employee, Kathy Page, recommended other positions to her that still contained "mandatory overtime" requirements.  Foster argues that this demonstrates retaliatory pretext, because Page was intentionally misleading her in order to string Foster along until her leave expired.

Foster points to no evidence other than her own opinion that Page attempted to "mislead" Foster into applying to positions that could not accommodate her six-hour work limit.  Foster's "subjective impressions, unsupported by record evidence supporting an inference that retaliation was the but-for cause of [United's] actions, are not sufficient.  Conclusory statements, unsubstantiated assertions, and speculation are not substitutes for specific facts showing that a genuine issue of material fact exists." *Matthews v. Brennan*, No. CV H-14-1825, 2017 WL 1956732, at *9 (S.D. Tex. May 11, 2017) (quoting *Quiros v. Wal-Mart Stores, Inc.*, No. 5:12-CV-177-C, 2014 WL 12531507, at *2 (N.D. Tex. Jan. 6, 2014)).  A plaintiff's belief that her employer acted on an illegitimate reason, without other evidence of pretext, is inadequate.  *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 362 (5th Cir. 2017) (citing *Sherrod v. Sears, Roebuck &*

*Co.*, 785 F.2d 1312, 1316 (5th Cir. 1986)).  Foster has not provided or pointed to evidence that Page did anything more than make an unwittingly unhelpful suggestion during a Reasonable Accommodation Program meeting.

To meet her burden at the summary judgment stage, Foster must raise a genuine issue of fact that United's stated reason for firing her was pretext for retaliation.  *See Equal Emp. Opportunity Comm'n v. Wal-Mart Stores, Tex., L.L.C.*, No. H-18-3407, 2021 WL 5165694 (S.D. Tex. Nov. 5, 2021) (citing *Caldwell*, 850 F.3d at 242).  But Foster has failed to identify summary judgment evidence supporting an inference that United's neutral, nonretaliatory reasons for termination are pretextual and that United's true motive was retaliation for Foster's protected activities.  Summary judgment is granted on Foster's retaliation claim.

## IV.   Conclusion

United's motion for summary judgment, (Docket Entry No. 47), is granted.  Foster's hostile work environment and retaliation claims are dismissed with prejudice.  Final judgment is entered by separate order.

SIGNED on June 22, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

25